In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-05-00111-CV
______________________________


                                       CHARLES A. LOPEZ, Appellant
 
V.
 
JOHN A. RUPERT, ET AL., Appellees


                                              

On Appeal from the 202nd Judicial District Court
 Bowie County, Texas
Trial Court No. 95C09734-202


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Memorandum Opinion by Chief Justice Morriss


MEMORANDUM OPINION
            Charles A. Lopez has filed an appeal from a judgment in his civil lawsuit against John A.
Rupert, et al., in connection with a series of grievances raised against the administration of the prison
in which he is housed. The judgment dismissing his lawsuit was signed June 27, 2005. The notice
of appeal was filed September 1, 2005. No motion for new trial was filed, nor was any document
which might be deemed such. 
            The notice of appeal was therefore due to be filed no later than thirty days after the date on
which the judgment was signed, on or before July 26, 2005. See Tex. R. App. P. 26.1. It was not
filed until over thirty days after that date. Accordingly, it is untimely, and cannot serve to invoke
the jurisdiction of this Court. 
            We dismiss the appeal for want of jurisdiction.
 
                                                                                    Josh R. Morriss, III
                                                                                    Chief Justice

Date Submitted:          September 12, 2005
Date Decided:             September 13, 2005





d population should be more than double
the risk in the unexposed or control population, but that such a relative risk is not a litmus test. Id.
at 717-18.

 In evaluating the admissibility of Dr. Hamer's testimony, the trial court considered several
articles exploring the purported link between head injuries and brain tumors. In an article titled
Intracranial Tumours published in 1888, Dr. B. Bramwell, a neurologist, wrote:

 Amongst the more direct causes [of tumor formation], injury occupies an important
place. There can, I think, be little doubt that blows and falls on the head do
sometimes lead to the formation of gliomatous, and perhaps also of sarcomatous
tumours; syphilitic tumours, too, not infrequently appear to owe their exciting cause
to a head injury; and in two instances I have known a scrofulous tumour to follow a
severe blow upon the head, the new growth developing either immediately below the
seat of the injury, or at the point of contre-coup. The explanation of such cases is
probably this, that the blow produces a local inflammatory lesion or contusion, which
forms a suitable nidus for the development of the tubercular germs (tubercle bacillus
or its spores) which are already circulating through the system.

 In Brain Tumors: Their Biology and Pathology, a textbook published in 1957, Dr. K. J.
Zülch, a professor of Neurology at the University of Cologne, wrote:

 A further possibility to learn more about the origin of brain tumors lies in the study
of the relationship between accidents and brain tumors. This involves the problem
of the traumatic origin of tumors which might be conceived of as being due to the
splitting-off (during trauma) of a tissue fragment that subsequently undergoes faulty
regeneration and becomes the "germ" of a future tumor.


 . . . .


 The possibility of the traumatic origin of brain tumors has been considered ever since
the time of classical neurology and pathology [citing Bramwell and others]. The
figures quoted vary between two and nine per cent [sic] of cases. Parker and
Kernohan wrote one of the best critical reviews of the significance of head injury in
the development of brain tumors. In a large series of tumor cases they found 13.4%
with a head injury but after critical evaluation found that in only 4.8% could a
connection between the trauma and the tumor be seriously considered. For
comparison, however, they produced a group of 431 patients of corresponding age
with other diseases, of whom 10.4% had a history of head trauma. Finally, in a
corresponding group of healthy individuals of the same age and occupation, 71 (i.e.,
35.5%) had a similar history of head trauma.


 . . . .


 Taking into consideration this previous work as well as our own knowledge of the
biology of brain tumors, the following prerequisites should be demanded.


 1. The patient should have been well before the accident . . . .

 2. The head trauma must have been adequate, i.e., sufficient to produce
a destruction of parts of the brain or its coverings leading to chronic regenerative
processes. . . . .

 3. The site of tumor formation must correspond to that receiving the
trauma . . . .

 4. The time interval between the trauma and the development of the
tumor should be adequate . . . .

 5. The  tumor  has  to  be  proved  histologically  at  autopsy  or  by
biopsy . . . .

 6. The external force should be defined as sufficient to be considered
true trauma . . . .


 In an article titled Glioma in Trauma, which was published in 1972 in a textbook titled
Pathology of the Nervous System, Elias Manuelidis outlined similar criteria: (1) authenticity and
adequacy of the trauma; (2) previous integrity of the wounded part; (3) origin of the tumor at the
exact point of injury; (4) a reasonable time interval between injury and the appearance of the tumor;
(5)  the  presence  and  nature  of  the  tumor;  (6)  the  trauma  should  be  histologically  proved; (7)
bleeding, edema, and scars (recent and old) secondary to the existence of the tumor, should be
clearly distinguished from the traumatic injury; and (8) the tumor should be in direct continuity with
the traumatic scar, not merely in its vicinity or separated by a narrow zone of healthy or slightly
altered tissue. Manuelidis then discussed numerous case studies and concluded:

 In summary it should be stated that a small number of gliomas were found at
the exact site of trauma and in direct continuity with brain scars. These cases
fulfilled the stringent criteria set forth for the evaluation of the subject tumor trauma. 
The importance of these reports in medico-legal matters is obvious. Their
significance for the pathogenesis of gliomas is, due to the small number of cases,
questionable.


 In evaluating these cases one should not have preconceived notions and
should not draw broad etiologic conclusions. However, these few cases do present
fascinating pathologic possibilities and represent an important general problem in
pathology.


 In a 1978 article titled Trauma and Brain Tumors: An Experimental Study, published in the
journal Neurosurgery, Dr. Robert Morantz and Dr. William Shain reported their findings from an
experiment conducted on rats. The rats were injected with a known carcinogen during gestation and,
after they were born, a group of those rats were "anesthetized and traumatized by insertion of a
25 gauge hypodermic needle into the left cerebrum." 

 The study showed sixty-two percent of the traumatized rats developed a cerebral glioma as
opposed to forty-seven percent of a control group. The traumatized group also exhibited a higher
incidence of glioma formation on the left side of the brain. The researchers concluded that
"intracerebral trauma can act as a cocarcinogen and enhance glioma formation," but that, "although
a very low statistical correlation between head trauma and brain tumor formation is possible, this
relationship seems to be of no clinical significance." 

 In a 1998 article published in the International Journal of Epidemiology, Susan Preston-Martin and others reported results from an epidemiological study of people with brain tumors. The
researchers concluded, "Evidence for elevated brain tumour risk after head trauma was strongest for
meningiomas in men." However, they also wrote:

 The fact that epidemiological studies, including this one, have not shown a
convincing causal relationship between head trauma and brain tumour development
may reflect the deficiencies of studies investigating this association and the fact that
the association, if one exists, is not a direct one.


 . . . .


 Our findings suggest that an association between head trauma and brain
tumour risk cannot be ruled out and should therefore be further studied.


 In  an  article  published  in  2000  in  the  British  Journal  of  Neurosurgery,  P.  T.  Henry
and V. Rajshekhar presented a case study of a patient who met the criteria outlined by Zülch and
Manuelidis. The authors also noted, "Epidemiological studies do not, however, support a definite
relationship between head injury and intracranial neoplasm." They summarized the prevailing
epidemiological evidence as follows:

 Parker & Kernohan recorded an incidence of 4.8% of mild head injury in a series of
431 patients with brain tumour. In a control group of 431 unselected patients with
other diseases and similar ages, the incidence of cranial trauma was 10.4% whereas
it was 35.5% in another group of 200 normal controls. The same authors followed
2858 individuals for 14 years who sustained a head injury in World War I and none
developed a brain tumour. Choi, et. al., did not find a significantly different
incidence of cranial trauma in a group of 126 patients with brain tumour and a
control group. Scheid recorded six brain tumours among 14,445 cases of missile
injuries (incidence=0.04%). Annegers followed 2953 patients with head injuries for
a total of 29,859 person-years, and did not find a difference between the actual and
the expected number of brain tumours, which were 4 and 4.1%, respectively. 
Experimental studies where neurocarcinogens were administered to animals and then
exposed to cranial trauma also produced contradictory results. However, Morantz
& Shain suggest that under certain conditions cranial trauma may act as a
cocarcinogen and enhance the rate of glioma formation in rats exposed to a potent
carcinogen.


 In Principles of Neurology, a foundational treatise in the field of neurology, the following
excerpt is found:

 Antecedent head injury, infection, metabolic and other systemic disease, and
exposure to toxins and radiation have all been invoked as causative factors; however,
with the exception of radiation and possibly viral infection, there is no conclusive
evidence that any of them play a part in the causation of cerebral neoplasms in
humans.


 The literature on which Dr. Hamer relied establishes that the medical community has long
hypothesized a causative relationship between head injuries and brain tumors; that doctors have
established a criteria for evaluating when, if ever, it could be said a particular brain tumor was
caused by a head injury; that cases have come to light which meet this criteria; that an animal study
showed a head injury could enhance the formation of a tumor; and that epidemiological studies have
been inconclusive in establishing a causative link between head injuries and brain tumors.

 Manasco contends Dr. Hamer based his opinion concerning general causation on the criteria
established by Zülch and Manuelidis, and his opinion concerning specific causation on his
examination of Jack Manasco, on Jack Manasco's patient history, and on the use of differential
diagnosis, i.e., ruling out other causes. Her argument is essentially that the Zülch/Manuelidis criteria
is generally accepted in the medical community, has been peer reviewed, and was developed for a
purpose other than for litigation. She contends that, because Dr. Hamer testified Jack Manasco's
tumor met each element of the Zülch/Manuelidis criteria, she met her burden of establishing a
causative link between Jack Manasco's head injury and his brain tumor.

 As we understand the medical literature presented to the trial court, however, the
Zülch/Manuelidis criteria was established to allow medical researchers to rule out instances of brain
tumors that were definitely not caused by a head injury. None of the articles took the step Dr. Hamer
took in the trial court, i.e., using the criteria to say it establishes a causal link. The medical literature
reflects that no such link has been established through epidemiological or other studies. Therefore,
the trial court was well within the zone of reasonableness in excluding Dr. Hamer's testimony. We
overrule the point of error.

 We affirm the judgment.


 Josh R. Morriss, III

 Chief Justice


Date Submitted: August 6, 2002

Date Submitted: October 10, 2002


Publish
1. While Merrell Dow Pharm., Inc. v. Havner, 953 S.W.2d 706 (Tex. 1997), was a toxic tort
case, the parallels to the present case are undeniable. In both cases, the plaintiffs had to prove an
injury was caused by a unique event (in Havner, the use of Bendectin; here, a head injury). In both
cases, there was a lack of data from controlled scientific experiments, causing the expert witnesses
to rely on epidemiological evidence. Therefore, we will apply the same analysis.